The STATE of Texas, Appellant,

v.

Heidi Schramm CONSAUL, Appellee.

No. 08–96–00343–CR.

Court of Appeals of Texas,
El Paso.

April 10, 1997.

682

Jaime E. Esparza, District Attorney, El Paso, for State.

Douglas Gelo, Scott Segall, Martin & Segall, El Paso, for appellee.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

*OPINION*

BARAJAS, Chief Justice.

This is a State's appeal from an order of the trial court granting Appellee's motion to suppress her oral and written statements. We affirm.

## I. SUMMARY OF THE EVIDENCE

The record in the instant case establishes that on Sunday, January 21, 1996, law enforcement officers were dispatched to the Horizon Lodge in Horizon City, Texas, in response to a reported kidnapping. Appellee, then residing at the Horizon Lodge, related to the responding officers that her eighteen-month-old child was missing. She stated that she left her apartment to make a telephone call and discovered the child missing upon her return. Appellee signed a prosecution statement and law enforcement officials started a search for the missing child.

Detective James Reuter of the El Paso County Sheriff's Department testified that he responded to the initial call and obtained information from Appellee regarding possible suspects in the purported kidnapping. The following day, January 22, 1996, Reuter asked Appellee if she would go to the County Sheriff's Office in order to discuss the matter away from the crowds and media. He testified that she agreed to go there, but further noted that she had a transportation problem in that her car was not in good running condition. She agreed to accompany Reuter. Detective Reuter stated, in transporting Appellee to the sheriff's office, she was not handcuffed and she rode in the front passenger seat. Appellee did not raise the issue of contacting an attorney.

Upon arrival at the sheriff's office, Detective Reuter met with Detectives Daniel Diaz and Onesimo Esparza. Together they conducted an interview with Appellee. Detectives Diaz and Esparza testified that throughout the interview, Appellee was never handcuffed and was otherwise free to leave, if she so desired. Appellee was purportedly being interviewed as a witness to the kidnapping. Detective Diaz stated that at the outset of the interview, Appellee was read her *Miranda* warnings. The detectives stated that Appellee was not under the influence of alcohol or drugs, was not promised anything or coerced with regard to the interview, and was never denied access to beverages, the bathroom, or cigarettes. Diaz testified that every time Appellee went to the bathroom, someone waited for her in the hall in order to monitor where she was in order to make sure she did not leave.

Detective Diaz further stated that the Appellee's interview was videotaped. This videotape was made part of the record at the hearing on Appellee's motion to suppress and is properly before this Court. This videotape does indeed establish that Appellee was read her *Miranda* warnings and she signed a card waiving those rights. The course of the interview initially involved the existence of various suspects and the circumstances under which Appellee's daughter disappeared. Appellee was asked if she would take a lie detector test. Appellee was then asked if she had harmed the child and the interview immediately became accusatory concerning the disappearance of her child. The detectives accused Appellee of lying about the circumstances of her daughter's disappearance. Nonetheless, Appellee continued to deny any knowledge of the whereabouts of her child. The videotape shows Sheriff's Detective Captain Gary Gabbert enter the interview room, question Appellee about various aspects of the case and likewise state that he did not believe Appellee's "story." Captain Gabbert then left the interview room. The interview continued at an increased pace, with the questions going back and forth between aspects of Appellee's story and accusations that she was lying. Appellee continually denied involvement in the disappearance. The following exchange then occurred:

DIAZ: You wish you could tell us.

APPELLEE: I wish I knew.

DIAZ: A lot of—

APPELLEE: I told you everything I know, everything.

DIAZ: No.

ESPARZA: Do you have a—

DIAZ: Do you want to go home?

APPELLEE: Yes, I want to go home.

DIAZ: Well, tell us so we can take you home. Just tell us where she's at.

APPELLEE: I told you everything.

DIAZ: Let's go pick her up. Let's go.

APPELLEE: I don't know where she is.

After further questioning, Esparza pushed the table back and both Esparza and Diaz got in close proximity to Appellee and appeared to touch and stroke her from time to time. Throughout the interview, Appellee was seated in the corner of the interview room. The following exchange occurred:

DIAZ: Don't hold it in.

APPELLEE: Am I allowed a lawyer still?

DIAZ: You need a preacher.

ESPARZA: That's what you need.

APPELLEE: This is ridiculous.

DIAZ: You need a preacher. She needs a preacher. She needs a preacher.

APPELLEE: I don't believe she's dead. I don't.

DIAZ: Why? Oh, things are getting to you now, huh? If you would have thought in the long run. 'Oh my God, things are going to happen,' you would have been more prepared, huh? But you weren't prepared for this type of interview, huh? You thought we were just going to—just skim it and go on your merry way and not even have a chance or an opportunity to look for Carina otherwise you would have been more prepared.

APPELLEE: I don't know where she is.

DIAZ: Just like in the movies. Why do you bring up movies all the time? You read papers. You read the real thing. You watch television. You know about that girl that was mentioned a little while ago, you know.

APPELLEE: I don't know where she is.

ESPARZA: You knew about it.

. . .

APPELLEE: Am I still allowed a lawyer?

DIAZ: You want a lawyer?

APPELLEE: Yes.

DIAZ: For what?

APPELLEE: Because it sure sounds like you guys are trying to imply me on this.

DIAZ: Well say if you want a lawyer. Don't ask us if you're entitled to a lawyer. You—you dreamt up this damn story. You tell us if you want a lawyer. I mean you're the one that's making this damn story up. For Christ's sake, you've been making the story up that you didn't kill your daughter; that somebody kidnaped her, some stranger—

APPELLEE: I didn't.

DIAZ: You tell us if you want a lawyer. I can't tell you. 'Hey, get a lawyer.' I can't tell you that.

APPELLEE: I just asked if I'm still allowed one.

DIAZ: What do you want? What do you want? You're intelligent. You came up with this classical theory and story that—you tell us. What do you want? What do you want? You want her to be found or not? What do you want?

APPELLEE: Yes, I want her to be found.

DIAZ: You want a lawyer? You tell us. You tell us.

APPELLEE: Yes, I want a lawyer.

DIAZ: Okay. Then we'll shut up. Huh? If you would have thought of this a long time ago, you would have buzzed, 'I want a lawyer', but we're never going to find her. You know that.

APPELLEE: We have to find her.

DIAZ: You live with that. You live with that. You live with that, girl. Here is your water if you need it.

ESPARZA: Why don't you go out and get yourself an attorney if that's what you want?

APPELLEE: I can't afford one. I need one—

DIAZ: No. You can find a way just like in the movies. And, in fact, we don't even want to talk to you no more. We'll be right back. We'll be right back. We'll be right back.

The record shows that after invoking her right to counsel, as shown above, the detectives terminated the interview. Appellee was

left alone in the room for a period of approximately twenty minutes after which time she was returned home. Both detectives stated that Appellee was free to leave during the interview and she never became a suspect and the Appellee voluntarily rode home with Reuter.

The following day, Detective Reuter contacted the FBI. As a result, the FBI began a kidnapping investigation. Ms. Cynthia Brawley, an FBI agent, stated that she interviewed Appellee but did not consider her as a suspect. She stated that a search was in progress for the missing child. Agent Brawley related that she was never informed that Appellee had previously invoked her right to counsel during the January 22 interview.

Detective Reuter testified that subsequent to the January 22 interview at which time she requested an attorney, he spoke with Appellee who agreed to take a polygraph test. Appellee stated that, "she had nothing to hide." Of greater significance to the ultimate outcome of the case before us is Detective Reuter's testimony regarding contacts between Appellee and law enforcement. Detective Reuter testified that Appellee did not initiate any contact with him, either on January 23 or 24. Moreover, Detective Reuter stated that he was not told anything concerning Appellee's prior request to see an attorney.

On January 24, Sheriff's Detective Timothy Cook transported Appellee to the sheriff's office. Appellee related to him that a relative had advised her to obtain an attorney. Detective Cook testified that he told her that she should do so if she felt it necessary. On that same day, Special Agent H.L. Byford of the FBI administered Appellee's polygraph examination. Detective Esparza testified that after Appellee took the polygraph test at the FBI office, Detective Reuter told both him and Detective Diaz that Appellee had demonstrated deception during the polygraph examination. Detective Esparza testified that immediately after the polygraph, both he and Detective Diaz came up to Appellee and greeted her. Appellee indicated to Detective Diaz that she did not know why the machine stated that she was lying. At that time, Appellee was asked if she wanted to talk about it, to which Appellee stated "yes." Appellee accompanied the detectives back to the sheriff's office.

The record shows that Detective Diaz testified that after Appellee made the statement pertaining to the polygraph "lying," he responded by telling Appellee that, "we will just go over to the office and we will talk there." He noted that in response to the question of why he could question Appellee again, Detective Diaz responded, "I took it upon myself." Once again, of greater significance to the ultimate outcome of the instant case is Detective Diaz's testimony that he initiated the contact with Appellee at the FBI office.

Detective Esparza testified that while at the sheriff's office, Appellee was once again advised of her *Miranda* rights, although there was no videotape made of the initial part of this second interview. During the course of this second interview, Appellee stated that she discovered that her child had fallen out of her crib and suffocated on a plastic bag. No signs of life were detected and she took the child out in the desert and left her there. The body of her eighteen-month-old child was subsequently found. Upon discovering the child's body, Appellee returned to the sheriff's office and gave a written statement.

The trial court found, among other matters, that the interview on January 22, 1996, was a custodial interrogation and Appellee had invoked her fifth amendment right to an attorney.

## II. DISCUSSION

In Points of Error Nos. One and Two, the State asserts that the trial court erred in suppressing Appellee's statements because there was no fifth amendment violation and there was no violation of Article 38.22 of the Code of Criminal Procedure. We disagree.

 A trial court has broad discretion in determining the admissibility of evidence, and we will not reverse absent a clear abuse of discretion. *Allridge v. State*, 850 S.W.2d 471, 472 (Tex.Crim.App.1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). On a motion to suppress evidence,

the trial judge is the sole and exclusive trier of fact and judge of the credibility of witnesses, including the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Cannon v. State,* 691 S.W.2d 664 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Laca v. State,* 893 S.W.2d 171, 177 (Tex.App.—El Paso 1995, pet. ref'd); *Lee v. State,* 893 S.W.2d 80, 84 (Tex.App.—El Paso 1994, no pet.); *Chavarria v. State,* 876 S.W.2d 388, 391 (Tex.App.—El Paso 1994, no pet.). In that regard, the trial court is free to believe or disbelieve the testimony of each of the State's witnesses as well as the evidence of the accused, if any. This appellate court must view the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling. *Romero,* 800 S.W.2d at 543. We dare not engage in our own factual review but merely decide whether or not the trial judge's findings of fact are supported by the record. If the findings are supported by the record, we are not at liberty to disturb them. Thus, on review, we only address the question of whether the trial court improperly applied established law to the facts. *Romero,* 800 S.W.2d at 543; *Laca,* 893 S.W.2d at 177; *Lee,* 893 S.W.2d at 84. Should the trial judge's determination be correct on any theory of law applicable to the case, it will be sustained. *Romero,* 800 S.W.2d at 543; *Laca,* 893 S.W.2d at 177; *Lee,* 893 S.W.2d at 84. This principle holds true even if the trial court should give the wrong reason for its decision, especially when that decision concerns the admission of evidence. *Romero,* 800 S.W.2d at 543; *Dugard v. State,* 688 S.W.2d 524 (Tex.Crim.App. 1985).

▆▆▆ At the outset, the State asserts that the Appellee was not in custody during the interview of January 22, 1997. A person is considered in "custody" only if a reasonable person would believe that his or her freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California,* 511 U.S. 318, 320–26, 114 S.Ct. 1526, 1528–1530, 128 L.Ed.2d 293, 298–99 (1994); *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996). The reasonable person standard presupposes an innocent person. *Id.* The subjective intent of law enforcement officials to arrest is not relevant unless that intent is communicated or otherwise manifested to the suspect. *Stansbury,* 511 U.S. at 326, 114 S.Ct. at 1530, 128 L.Ed.2d at 300; *Dowthitt,* 931 S.W.2d at 254.

Formerly, the following four factors were utilized to determine custody:

(1) Probable cause to arrest;

(2) Subjective intent of the police;

(3) Focus of the investigation; and

(4) Subjective belief of the defendant.

*Meek v. State,* 790 S.W.2d 618, 621–22 (Tex.Crim.App.1990). Under the *Stansbury* decision, factors two and four are irrelevant except to the extent that they are manifested in the words or actions of law enforcement officials. The determination of custody is based entirely upon objective circumstances. *Stansbury,* 511 U.S. at 320, 114 S.Ct. at 1528, 128 L.Ed.2d at 298; *Dowthitt,* 931 S.W.2d at 254. This determination is made on an *ad hoc* basis, after consideration of all the objective circumstances. *Id.*

▆▆▆ When a person is transported to a police facility by the police in the course of an investigation, if the person was acting upon the invitation, request, or even the urging of the police and there were no threats, express or implied that he or she will be taken in a forcible manner and the accompaniment is voluntary and consensual, then the individual is not in custody. *Anderson v. State,* 932 S.W.2d 502, 505 (Tex.Crim.App. 1996); *Shiflet v. State,* 732 S.W.2d 622, 630 (Tex.Crim.App.1985). Station house questioning does not, by itself, constitute custody. *Dowthitt,* 931 S.W.2d at 255. However, the fact that an interrogation may begin as noncustodial does not prevent custody from arising later; the conduct of the police during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Id.; Ussery v. State,* 651 S.W.2d 767, 770 (Tex.Crim.App.1983).

▆▆▆ There are four general situations which may constitute custody:

(1) When the suspect is physically deprived of his or her freedom in any significant way;

(2) When a law enforcement official tells the suspect that he or she cannot leave;

(3) When law enforcement officials create a situation that would lead a reasonable person to believe there has been a significant restriction upon his or her freedom of movement; and

(4) When there is probable cause to arrest and law enforcement officers do not tell the suspect that he or she is free to leave.

*Shiflet,* 732 S.W.2d at 629. Regarding the first three situations above, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to mere investigative detention. *Dowthitt,* 931 S.W.2d at 255. Regarding the fourth and final situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.* This manifestation could occur if some information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Further, as probable cause is a "factor" in other cases, the fourth situation does not automatically establish custody. Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he or she is under restraint to the degree associated with an arrest. *Id.*

 In the present case, we find that the trial court was warranted in finding that the interrogation of January 22 was custodial in nature. The actions of Detectives Diaz and Esparza of placing themselves in extremely close physical proximity to Appellee, while Appellee is situated in a corner with no apparent avenue of egress, and touching her and crowding her could very well be interpreted as conveying to her that her freedom was restricted. The trial court found as much, and we agree. The statement by Detective Diaz that Appellee could go home if she stated where the child was located is subject to the factual interpretation that Appellee was not otherwise free to leave the interview room until she changed her story. Once again, the trial court found as much,

and we agree. There was testimony, albeit contradicted, that the officers took Appellee to the restroom and then waited for her until she came out in order to insure she did not leave. We find that the trial court very well could have determined that these factors were indicated to Appellee to the extent that would lead a reasonable person to believe there had been a significant restriction upon his or her freedom of movement to a degree associated with arrest. Given the above, we find that the trial court did not err in finding that Appellee was in custody during the initial interview of January 22, 1996.

The State maintains that Appellee's invocation of counsel at that initial interview was equivocal. Specifically, the State maintains that Appellee was still asking for the assistance of the police in finding the child during her invocation of counsel, thus ameliorating the effect of the invocation of counsel. We disagree, given the following unequivocal statement:

DIAZ: You want a lawyer? You tell us. You tell us.

APPELLEE: Yes, I want a lawyer.

 Once a suspect invokes her fifth amendment right to counsel, she cannot be further interrogated by law enforcement officers until counsel has been provided or the suspect initiates further communication with the police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Green v. State,* 934 S.W.2d 92, 97 (Tex.Crim.App.1996). The mere mention of the word "attorney" or "lawyer," without more does not automatically invoke the right to counsel. *Etheridge v. State,* 903 S.W.2d 1, 18 (Tex.Crim.App.1994). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer would have only understood that the suspect might be invoking the right to counsel, there is no requirement for the cessation of questioning. *Dinkins v. State,* 894 S.W.2d 330, 351 (Tex.Crim.App. 1995). The phrase, "Maybe I should talk to a lawyer" had been held to be too equivocal to constitute an invocation of the right to counsel. *Id.* at 352. However, the statement, "I think I want a lawyer" was held to be a clear and unequivocal assertion of right

to counsel. *Id.* Viewing the evidence in the instant case, in a light most favorable to the trial court's ruling, we find that the trial court was warranted in finding that the invocation of right to counsel was unequivocal.

 The State next contends that Appellee reinitiated contact with the law enforcement officers. An accused may effectively waive her right to assistance of counsel if she initiates contact with the police or law enforcement officials. *Baldree v. State,* 784 S.W.2d 676 (Tex.Crim.App.1989). Although an accused may thereafter initiate further communication and waive the right to counsel previously invoked, a valid waiver of the right to counsel cannot be established by showing only that the accused responded to further police-initiated custodial interrogation. *Hicks v. State,* 860 S.W.2d 419, 429–30 (Tex.Crim.App.1993). *Jones v. State,* 742 S.W.2d 398, 405–06 (Tex.Crim.App.1987). The burden is clearly upon the State to affirmatively prove the accused initiated further contacts with agents of the State. *Wilkerson v. State,* 657 S.W.2d 784, 793 (Tex. Crim.App.1983).

 In the instant case, it is clear that Appellee invoked her right to consult with an attorney. The record is wholly silent as to whether that invocation was conveyed to the various law enforcement agencies working in conjunction to solve this "staged" kidnapping. What is apparent on the record is the fact that Appellee's invocation of her right to consult with an attorney was not communicated to the other law enforcement officials involved in the case. Knowledge of the invocation of any *Miranda* rights must be imputed to all representative of the State in order to preserve the efficacy of the suspect's rights. *Sterling v. State,* 800 S.W.2d 513 (Tex.Crim.App.1990); *see Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).

 We have viewed the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling. We find some evidence that law enforcement officers, not Appellee, reinitiated the contact to take the polygraph. Moreover, we find some evidence that law enforcement officers, not Appellee, reinitiated the contact by asking Appellee if she wanted to make a statement after knowing she had invoked her right to counsel. Given the above, we find that the State has failed to meet its burden in demonstrating that Appellee reinitiated contact. Points of Error Nos. One and Two and all their subparts are overruled in their entirety.

Having overruled Points of Error Nos. One and Two, we find it unnecessary to address Appellee's Cross–Points. We affirm the trial court's order that all statements made by Appellee, after invoking her right to counsel on January 22, 1996, be suppressed.[1]

---

1. Appellee presents three cross-points. In Cross–Point No. Three, she challenges the jurisdiction of this Court to hear the appeal because the State's notice of appeal dates from the date of the order dated June 27, 1996. Appellee maintains that the notice of appeal should date from July 2, 1996—the date of the supplemental order.

That hearing was characterized as a bill of review. The findings adduced from that hearing are clearly supplemental to the date of the first order. Moreover, Appellee cites no authority in support of her proposition, nor does she provide cognizable argument beyond her conclusory assertion.