

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-16-00273-CR |
| Appellant, | § | Appeal from |
| v. | § | 83rd District Court |
| JULIAN ANDREW LUNA, | § | of Pecos County, Texas |
| Appellee. | § | (TC # P-3208-83-CR) |
| | § | |

## O P I N I O N

The State of Texas is appealing an order suppressing the recorded statements of Julian Andrew Luna. The indictment alleges that Luna intentionally and knowingly caused the death of Ruben Salazar, Jr. by stabbing him with a knife. The trial court granted Luna's motion to suppress two recorded interviews that he gave to law enforcement officers, finding that Luna did not voluntarily waive his *Miranda* and Article 38.22 rights prior to either interview, and that his confession was involuntary due to alleged threats made by the officers during the interview. Finding that the trial court abused its discretion by suppressing the evidence, we reverse and remand.

### FACTUAL SUMMARY

The evidence admitted at the suppression hearing showed that, at approximately 2:30 a.m. on the morning of May 30, 2015, Luna and two of his family members, including his wife, were

involved in a fight outside Luna's home in Iraan, Texas, with the victim, Ruben Salazar, Jr. (referred to as Ruben or the victim), and his brother, Albert Salazar (referred to as Albert). After the fight ended and the Salazar brothers had driven away, Luna called 911 to report the incident. Pecos County Deputy Sheriff Pedro Galvan went to the hospital where the victim had been taken and encountered Albert outside. Albert informed Deputy Galvan that his brother had been in a fight with Luna. Although Deputy Galvan considered "everybody" to be a suspect in the stabbing at that point in the investigation, he formed an opinion, based on Albert's statements, that Luna was the main suspect.[1] Deputy Sheriff Wesley Evans picked up Luna at his house and took him to the sub-station in Iraan in his patrol car. Luna rode in the back seat of the patrol car, but was not handcuffed. Luna testified that he felt he had no choice but to go with Deputy Evans to the sub-station in Iraan. Deputy Evans did not testify at the suppression hearing.

*The First Recorded Interview*

At the Iraan sub-station, Deputy Evans began interviewing Luna at 9:37 a.m. The interview lasted about twenty minutes. At the beginning of the interview, Deputy Evans advised Luna that he was a "suspect" in the case until his name was "cleared." Deputy Evans then read Luna his *Miranda*[2] rights. Deputy Evans expressly asked Luna if he understood those rights to which Luna replied, "Yes, sir." Immediately thereafter, Deputy Evans asked Luna, "Can you tell me everything that happened?" Luna responded, "Yes, sir. Glad to tell you," and began recounting the events of that morning.

---

[1] Deputy Galvan also spoke with Luna's wife, Jasmine Leal, briefly that morning but she did not provide a written or recorded statement.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

According to Luna, he had been out in front of his house at approximately 2:30 a.m., drinking beer with his wife, Jasmine Leal, her sister and her cousin, when the Salazar brothers drove up and exited their truck. Luna, who was previously acquainted with Ruben, stated that he considered him to a "good guy," but thought that there was something wrong with him when he arrived, and observed that he appeared to be very drunk. The victim "ball[ed] up his fists," and Luna and his wife both asked him to leave.

Luna claimed that Ruben attacked him and a fight broke out. During the fight, Ruben held Luna down while Albert punched him. Luna's wife and her family members tried to help him and were punching Albert. At some point during the fight, either the victim or Albert released Luna in order to get a bat. Luna was afraid so he went inside his house to get his gun. He claimed, however, that by the time he came back outside, the Salazar brothers were driving away and appeared to be fighting with each other as they drove off.

During the interview, Luna repeatedly denied stabbing the victim, and claimed that he did not have a knife with him during the fight. At the close of the interview, Luna gave Deputy Evans permission to search his home stating that he didn't have anything to hide and wanted to clear his name. Deputy Evans thereafter transported Luna back to his house in his patrol car.

*The Second Recorded Interview*

After Deputy Evans completed the search of Luna's house he left and did not return until later that afternoon. Deputy Evans picked up Luna and transported him to the Pecos County Sheriff's Office in Fort Stockton. Once again, Luna rode in the back seat of the deputy sheriff's vehicle, but was not handcuffed. Luna testified that he felt that he did not have any choice but to accompany Deputy Evans to the Sheriff's Office in Fort Stockton.

3

At the Sheriff's Office, Luna was interviewed by Deputy Galvan, along with Deputy Evans and Deputy Perkins. This interview began at 3:09 p.m. and concluded at 4:24 p.m. Deputy Galvan read Luna his *Miranda* rights, and then asked Luna if he understood his rights, to which Luna responded: "Yes, sir, I understand them." Deputy Galvan then asked Luna if he still wanted to talk to them, and Luna responded: "Yes, sir. I have no problem." Deputy Galvan asked Luna to confirm that the deputies were not threatening him or "twisting [his] arm," and Luna replied that they were not, and that he was "glad" he came there because he wanted to "get the truth out."

In the second interview, Luna repeated many of the same elements of his story, again claiming that the victim and Albert had come to his home and had started the confrontation with him. Luna reported that the victim and Albert not only appeared to have been very drunk, but that they also had been doing "coke" and "meth" before arriving at his home. Luna recalled that he and his wife both repeatedly told the victim to leave, and that his wife told the victim that if he didn't leave she would "cut [his] face." Albert initiated the fight by tackling Luna to the ground, and Ruben began hitting Luna on his head and kicking him in the back. Luna fought back by hitting Ruben on the head. Luna's family members, including his wife, tried to help him, and his wife started hitting the victim, and then "everybody" got involved. According to Luna, they were all "rolling on top" of each other, "everybody [was] hitting Albert," "punching," and "going at it."

During the initial phases of the second interview, Luna repeatedly denied that he had a knife during the fight, and claimed that neither he nor any of his family members had stabbed the victim. Luna insinuated that Albert may have stabbed the victim when the two of them drove away because he had seen them fighting as they drove off.

4

*The Alleged Threats*

During the interview, Deputy Galvan advised Luna that they had the handle of the knife that was used to stab the victim, and they intended to send the handle in for testing. Galvan asked Luna what he would "say when they call back and there's your DNA on there, and there's your fingerprints on there?" When Luna again denied that he had a knife with him during the fight, Deputy Galvan pointed out that all of Luna's family members were at the scene, and the following dialogue occurred:

DEPUTY GALVAN: They're going to get charged with murder too, a party to the offense.

LUNA: Part of the offense?

DEPUTY GALVAN: They're all going to go down for murder.

LUNA: But how--how are--how are they going to go down for murder when there's--like you're taking the drunk people's as, you know…

DEPUTY GALVAN: Because you got in a fight with him; you stabbed him--

\* \* \*

DEPUTY GALVAN: And you lied to us.

Deputy Galvan then told Luna that his "story" was different from the information obtained from the other individuals, asserting that their stories matched and his did not. Deputy Perkins then joined in, and the following dialogue occurred:

DEPUTY PERKINS: That's straight-up, straight-up. And I hate to see -- I hate to see your wife or your girlfriend brought in.

LUNA: I hate to see it too. I got four kids.

DEPUTY GALVAN: Are those your kids?

LUNA: Those are all my kids. They're little ones.

5

DEPUTY GALVAN:   Cause you realize what's going to happen?

LUNA:   Yes, sir.

DEPUTY GALVAN:   You probably won't see them again.   You will at their visitation.   And they're not going to have a momma either.

A lengthy dialogue then occurred in which Luna again repeated his story that "everybody" was involved in the fight with the victim, including his wife, but he did not know how the victim got stabbed, and he did not wish to accuse his wife or her family members of stabbing the victim. After Luna suggested that he had observed another individual running from the scene, the following dialogue then occurred:

DEPUTY GALVAN:   So you're going to let everybody else go down for this?

LUNA:   What do you mean, sir?   You're trying to get me to say --

DEPUTY GALVAN:   So one of four people stabbed that man and killed him, you, your wife, her sister or her cousin.   One of you four stabbed him and killed him.

LUNA:   One of us four stabbed him and killed him? One of us stabbed him and killed him?   So the ones [the victim] was with, they're totally out of it; right?

During the course of this second interview, the deputies pointed out inconsistencies in Luna's story, confronting Luna with the fact that he had blood on his shirt, and that there was blood on the street in a different area than where Luna claimed the fight took place.   Luna admitted that he had blood on his shirt, but claimed that he did not know how it got there, and he could not provide any explanation for why there was blood on his shirt and in the street.   In addition, the deputies observed that Luna had cuts on his hand, but Luna claimed that he cut himself while working as a drilling rig operator.   The deputies told Luna that they had the handle to the knife that had been used to stab the victim, and that they would be sending it for testing to see if it had his

DNA or fingerprints on it. During the second interview, the deputies took a DNA swab from Luna's cheek.

After the deputies repeatedly told Luna that they did not believe his story, and after at least twice discussing the possibility that Luna may have acted in self-defense, Luna began to change his story. Luna recalled that after the victim "jumped" him, he felt threatened and feared for his life, particularly after he thought the two brothers were threatening him with a baseball bat. In addition, Luna claimed that the victim had his hands in his pocket, causing Luna to believe that he may have had a knife and may have intended to stab him.

Luna admitted that he had a knife at some point during the fight, saying first that he retrieved it from a nearby tackle box, and later saying that he had the knife in his pocket. He further admitted that he stabbed the victim one time, describing it as a "poke," which he did not believe would have caused the victim any "harm." Luna also claimed that he did not intend to kill the victim, and repeatedly expressed that he acted in self-defense. Luna also explained that he lied to the police at first because he was scared to tell them the truth.

After admitting to stabbing the victim, Luna stated at least twice that his family members were innocent, that they were just trying to help him after the victim attacked him, and that he did not want them to get in trouble. Deputy Galvan, however, once again explained that the family members could be liable as parties to the offense. After the interview terminated, Appellant was arrested and charged with murder.

*The Motion to Suppress*

Luna filed a pretrial motion to determine the admissibility of the statement he provided at the second interview, arguing that it was not given freely and voluntary due to the allegedly improper threats the deputies made to arrest his family members and take away his children. At

7

the pre-trial hearing held on the day of the jury trial, defense counsel also argued that the *Miranda* warnings given to Luna were inadequate and that Luna failed to "affirmatively" waive his Miranda rights prior to both interviews.

The trial court granted Luna's motion to suppress both recorded interviews and issued written findings of fact and conclusions of law. Despite determining that Luna was not in custody during either interview, the trial granted the motion to suppress because the deputies did not properly advise Luna of his right to waive his constitutional rights in compliance with Article 38.22. The court also concluded that Luna did not understand his constitutional rights because he had only a seventh grade education. The trial court determined that the entire second recorded interview was involuntary because the deputies threatened (1) to arrest Luna if he did not admit to stabbing the victim; and (2) to arrest Luna's wife, his wife's sister, and his wife's cousin, and to take his children away unless he confessed to stabbing the victim. Finally, the trial court concluded that the deputies did not have "probable cause" to believe that these family members were "involved in the stabbing or death" of the victim.

## SUPPRESSION OF THE RECORDED STATEMENTS

In three issues, the State contends that the trial court abused its discretion by granting Luna's motion to suppress both State's Exhibits 1 and 2. Although the issues are related and there is some overlap of the facts and law, we will address the issues separately.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress for an abuse of discretion and apply a bifurcated standard of review. *See Weems v. State*, 493 S.W.3d 574, 577 (Tex.Crim.App. 2016); *see also Brodnex v. State*, 485 S.W.3d 432, 436 (Tex.Crim.App. 2016); *State v. Alderete*, 314 S.W.3d 469, 472 (Tex.App.--El Paso 2010, pet. ref'd). Under this bifurcated standard, we

8

afford almost total deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of witness credibility and demeanor. *Furr v. State*, 499 S.W.3d 872, 877 (Tex.Crim.App. 2016); *Brodnex*, 485 S.W.3d at 436. When the trial court makes express findings of fact, as in this case, we must first determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex.Crim.App. 2010). We conduct a *de novo* review of mixed questions of law and fact that do not hinge on credibility or demeanor, as well as the trial court's application of the law to the facts. *Brodnex*, 485 S.W.3d at 436. Additionally, we must afford *de novo* review with regard to pure questions of law. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex.Crim.App. 2011).

### The State of the Record

It is necessary to address the state of the record before reviewing the merits of the issues presented by the State. During the suppression hearing, which was conducted on the same day the jury trial was scheduled to begin, the State marked the video recordings of the two interviews as State's Exhibit 1 (the Fort Stockton interview, also referred to by the parties as the second interview) and State's Exhibit 2 (the Iraan interview, also referred to by the parties as the first interview). The State did not formally offer State's Exhibit 1 and 2 into evidence for purposes of the pre-trial hearing or "the record", but it is undisputed that both exhibits were viewed by the trial court. The reporter's record clearly reflects that both video-recorded interviews were played in the courtroom and were transcribed by the court reporter.[3] Neither the State nor Luna have taken issue with the accuracy of the court reporter's transcription of the audio portion of the recorded

---

[3] The reporter's record states that State's Exhibit 1 was played from 9:05 a.m. to 10:22 a.m., and State's Exhibit 2 was played from 10:35 a.m. to 10:55 a.m.

9

statements, but on our own motion, we ordered the court reporter to forward a copy of both exhibits for our use in resolving the issues presented on appeal. *See* TEX.R.APP.P. 34.6(g)(2).

## ISSUE ONE -- THE CUSTODY DETERMINATION

In Issue One, the State contends that Luna was not in custody during either of the interviews, and therefore, the requirements of Article 38.22 and *Miranda* are inapplicable. In Issue Two, the State advances the alternative argument that even if Luna was in custody, he effectively waived his rights under Article 38.22 and *Miranda* and proceeded to talk to law enforcement.

*Miranda* warnings are required only when a person is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966)(holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *see also Herrera v. State*, 241 S.W.3d 520, 525 (Tex.Crim.App. 2007)(explaining that *Miranda* warnings "safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation"). Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444; *Herrera*, 241 S.W.3d at 525. A person is in custody for purposes of *Miranda*, "only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Herrera*, 241 S.W.3d at 525; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App. 1996). This reasonable person standard requires us to examine all of the objective circumstances surrounding the questioning. *Herrera*, 241 S.W.3d at 525. The subjective belief of law enforcement officials about whether a person is a suspect does not

10

factor into the "custody" determination unless that subjective belief was somehow conveyed to the person being interrogated. *Id.*

Article 38.22 governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. *Herrera*, 241 S.W.3d at 526. Under Section 3, an oral custodial statement is admissible against a defendant in a criminal proceeding if, among other things: (1) the statement was electronically recorded; (2) the defendant was given the warnings set out in Section 2(a) before the statement was made and it is included on the recording; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 3; *Herrera*, 241 S.W.3d at 526. The warnings provided in Section 2(a) are virtually identical to the *Miranda* warnings, except Article 38.22 adds the requirement that the accused be warned that he "has the right to terminate the interview at any time." *Herrera*, 241 S.W.3d at 526, *quoting* TEX.CODE CRIM.PROC.ANN. art. 38.22, § 2(a)(5). Section 2(a)'s warnings are required only when there is a custodial interrogation. *Herrera*, 241 S.W.3d at 526; TEX.CODE CRIM.PROC.ANN. art. 38.22, § 5 ("Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, *or of a statement that does not stem from custodial interrogation*, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law."). [Emphasis added]. The concept of "custody" for purposes of Article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Herrera*, 241 S.W.3d at 526.

11

There are four general situations that may constitute custody and thus require the warnings of *Miranda* and Article 38.22: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *State v. Saenz*, 411 S.W.3d 488, 496 (Tex.Crim.App. 2013); *Dowthitt*, 931 S.W.2d at 255. The first three situations require the suspect's freedom of movement to be restricted to the degree associated with arrest, not merely that of an investigative detention. *State v. Saenz*, 411 S.W.3d at 496. The fourth requires the manifestation of probable cause to be combined with other circumstances that would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

Station house questioning does not, by itself, constitute custody. *Dowthitt*, 931 S.W.2d at 255. The fact that an interrogation may begin as noncustodial does not prevent custody from arising later; the conduct of the police during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Id*. When a person is transported to a law enforcement facility by an officer in the course of an investigation, if the person was acting upon the invitation, request, or even the urging of an officer, and there were no threats that he would be taken in a forcible manner, and the accompaniment is voluntary, then the individual is not in custody. *Anderson v. State*, 932 S.W.2d 502, 505 (Tex.Crim.App. 1996); *State v. Consaul*, 960 S.W.2d 680, 686 (Tex.App.--El Paso 1997), *pet. dismissed*, 982 S.W.2d 899 (Tex.Crim.App. 1998).

The trial court concluded that Luna was not in custody. A trial judge's ultimate custody determination for purposes of Article 38.22 and *Miranda* presents a mixed question of law and

12

fact. *Herrera*, 241 S.W.3d at 526. Consequently, we must afford almost total deference to this custody determination when the questions of historical fact turn on credibility and demeanor, but we will review the determination *de novo* if the questions of historical fact do not turn on credibility and demeanor. *Herrera*, 241 S.W.3d at 526-27.

We also keep in mind that it was Luna's burden to present evidence showing that State's Exhibits 1 and 2 were the product of custodial interrogation. *See Herrera*, 241 S.W.3d at 526. The State has no burden to show compliance with *Miranda* and Article 38.22 unless and until the record as a whole clearly establishes that the defendant's statement was the product of custodial interrogation. *Id*.

The evidence shows that Deputy Evans picked up Luna at his house and took him to the Sheriff's Office substation in Iraan in his patrol vehicle. Luna rode in the back seat of the patrol car, but was not handcuffed. While Luna testified that he felt he had "no choice" but to go with Deputy Evans, there is no evidence that the deputy threatened to use force to compel Luna to go with him. At the beginning of the first interview (State's Exhibit 2), Deputy Evans informed Luna that he was going to give him the *Miranda* warnings. Deputy Evans told Luna that he was a suspect "[u]ntil we completely clear your name." Deputy Evans did not tell Luna or otherwise convey to him that the officers had probable cause to arrest him for the murder. The interview lasted only twenty minutes and Luna agreed to Deputy Evans' request to search his home because he wanted to clear his name. Deputy Evans then drove Luna back home.

The evidence demonstrates that Luna was not in custody at the time he gave the first video-recorded statement (State's Exhibit 2). *See California v. Beheler*, 463 U.S. 1121, 1122-25 (1983)(per curiam)(defendant was not in custody when he voluntarily came to police station, gave a statement after brief questioning, and then was allowed to return home). Thus, the requirements

13

of *Miranda* and Article 38.22 are inapplicable to the first video-recorded statement. *See Herrera*, 241 S.W.3d at 525. The trial court abused its discretion by concluding that the evidence should be suppressed because Deputy Evans failed to affirmatively ask Luna whether he waived his rights and because Luna did not voluntarily waive his rights.

Turning to the second interview (State's Exhibit 1), the evidence shows that Deputy Evans picked up Luna at his house and took him to the Sheriff's Office in Fort Stockton. While Luna again testified that he felt he did not have a choice and Deputy Evans told him to "jump in" the vehicle, there is no evidence that Deputy Evans threatened to use physical force to compel Luna to go with him to Fort Stockton. Deputy Galvan testified at the suppression hearing that he did not tell Luna he was under arrest at any time prior to the second interview and he did not tell Luna he was a suspect. Further Deputy Galvan told Luna he was free to leave and he provided him with his *Miranda* warnings. Luna confirmed on the recording that he understood those rights. Further, Luna told Deputy Galvan that he wanted to talk with them. In contrast with his testimony at the suppression hearing, Luna told Deputy Galvan that the deputies were not threatening him or forcing him to speak with them, and he was glad to be there because he wanted to "get the truth out." The evidence establishes that Luna was not in custody at the time he made the second video-recorded statement (State's Exhibit 1). *See California v. Beheler*, 463 U.S. at 1122-25. Because the requirements of *Miranda* and Article 38.22 are inapplicable to the second video-recorded statement, the trial court abused its discretion by ruling that the statement had to be suppressed because Deputy Galvan failed to affirmatively ask Luna whether he waived his constitutional and statutory rights and because Luna did not voluntarily waive his rights. Issue One is sustained.

## ISSUE TWO--LUNA VOLUNTARILY WAIVED HIS RIGHTS

In Issue Two, the State argues that even if the evidence establishes that Luna was in custody during both interviews, he waived his rights and voluntarily gave his statements to law enforcement. The trial court suppressed the statements based on its findings that Luna did not understand his rights because he has only a seventh grade education and the deputies failed to expressly ask Luna whether he waived his rights before interviewing him.

*Luna's Education Level*

The trial court suppressed the evidence based on its finding that Luna did not voluntarily waive his constitutional and statutory rights because he had only a seventh grade education. Determination of whether a statement was voluntarily made is based on an examination of the totality of the circumstances surrounding its acquisition. *See Wyatt v. State*, 23 S.W.3d 18, 23 (Tex.Crim.App. 2000). Mental deficiency is a factor, but not alone determinative, in ascertaining the voluntariness of a confession and the waiver of rights necessary to give a statement. *Penry v. State*, 903 S.W.2d 715, 744 (Tex.Crim.App. 1995). The mere fact that a defendant is uneducated and illiterate does not mean that he does not understand the nature of the rights he is waiving or that he cannot voluntarily make a statement to law enforcement officers. *See Peacock v. State*, 819 S.W.2d 233, 235 (Tex.App.--Austin 1991, no pet.). The Court of Criminal Appeals has in many cases found confessions to be voluntary even where the defendant was illiterate. *See e.g., Westley v. State*, 754 S.W.2d 224, 227 (Tex.Crim.App. 1988)(inability to read and write, low level of intellect and little educational experience did not prevent defendant from understanding warnings read to him and waiving them); *Combs v. State*, 643 S.W.2d 709, 711-14 (Tex.Crim.App. 1982), *overruled on other grounds*, *Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App. 1989)(mentally retarded person with I.Q. of 55 to 70, with a functioning age level of five to eight years, and unable to read or write, was mentally capable of voluntarily waiving his

15

constitutional rights); *Casias v. State*, 452 S.W.2d 483, 488 (Tex.Crim.App. 1970)(confession admissible even though defendant had I.Q. of 68, was illiterate, and had mental age of eight to ten years); *White v. State*, 591 S.W.2d 851, 858 (Tex.Crim.App. 1979), *overruled on other grounds*, *Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App. 1994)(confession admissible even though defendant was borderline mentally retarded); *Bell v. State*, 582 S.W.2d 800, 809 (Tex.Crim.App. 1979)(mildly retarded person who participated in a special education program was not incapable of waiving rights and making confession); *Grayson v. State*, 438 S.W.2d 553, 555 (Tex.Crim.App. 1969)(statements admissible from defendant with I.Q. of 51 and mental age of six years). We are required to consider factors other than literacy when determining whether the defendant made a voluntary, knowing, and intelligent waiver of his rights. *See Peacock*, 819 S.W.2d at 235. The defendant's competency to stand trial, his general capacity to understand, and his testimony in court, are relevant and may support a conclusion that he voluntarily, knowingly, and intelligently waived his rights. *Id.*

While Luna may have limited formal education, he expressed himself clearly and intelligently during both interviews and his testimony at the suppression hearing. He also demonstrated a capacity to understand his rights, the questions being put to him, and the significance of the proceedings. The trial court erred by focusing solely on Luna's education level when determining the voluntariness of Luna's statements. After considering the totality of the circumstances, we conclude that Luna understood his rights and voluntarily waived them.

### *Express Waiver of Rights Not Required*

The trial court also suppressed the evidence because the deputies did not expressly ask Luna whether he waived his constitutional and statutory rights. Neither *Miranda* nor Article 38.22 required the deputies to expressly ask Luna whether he waived these rights. Likewise, the

16

law does not require that the person being interrogated make an express waiver of rights. It is well established that a waiver of rights may be inferred from the actions and words of the person being interrogated. *State v. Oliver*, 29 S.W.3d 190, 191-92 (Tex.App.--San Antonio 2000, pet. ref'd), *citing Mays v. State*, 726 S.W.2d 937, 946 (Tex.Crim.App. 1986) *and Barefield v. State*, 784 S.W.2d 38, 40-41 (Tex.Crim.App. 1989), *overruled on other grounds by Zimmerman v. State*, 860 S.W.2d 89, 94 (Tex.Crim.App. 1993). Further, the Court of Criminal Appeals has declined to interpret Article 38.22 as requiring as express verbal statement from an accused that he waives his rights prior to giving an oral statement. *See Barefield*, 784 S.W.2d at 40-41. The Court has also held that an express waiver of rights stated on the recording is not required if the recording reflects that the person understood his rights. *See Rocha v. State*, 16 S.W.3d 1, 12 (Tex.Crim.App. 2000); *Etheridge v. State*, 903 S.W.2d 1, 16-17 (Tex.Crim.App. 1994). As already detailed in the factual summary, the deputies read Luna's rights to him during both recordings and Luna expressly confirmed that he understood those rights. Luna then proceeded without any hesitation to participate in the interview and answer the deputies' questions. During the second interview while discussing his claim of self-defense, Luna asked the deputies, "Should I have somebody fighting for me? Like--you know, like a lawyer or something . . . ." The deputies immediately stopped questioning Luna and asked him whether he wanted a lawyer or to stop the interview. Luna said he did not need an attorney because he was telling them the truth about the incident and he wanted to continue the interview. It is evident in the record that Luna understood his right to counsel but he chose to waive that right because he wanted to present his claim of self-defense. Other than that discussion, Luna gave no indication during either interview that he wished to invoke his right to counsel or to terminate the interview, and the evidence does not support a conclusion that Luna did not intend to waive his right to remain silent. Because it

17

can be inferred from the record that Luna knowingly, voluntarily, and intelligently waived his rights, the trial court abused its discretion by concluding otherwise. Issue Two is sustained.

## ISSUE THREE--THREATS MADE BY DEPUTIES

In Issue Three, the State asserts that the deputies' statements made during the second interview (State's Exhibit 1) were an accurate representation of the situation and did not render Luna's statements involuntary. A confession may be rendered inadmissible under both the Due Process Clause and Article 38.22 of the Code of Criminal Procedure if it was not voluntarily made. *Oursbourn v. State*, 259 S.W.3d 159, 169-70 (Tex.Crim.App. 2008). Under the Due Process Clause, a statement may be rendered involuntary due to police overreaching or misconduct, but only if it rises to the level at which the defendant's will was "overborne and his capacity for self-determination critically impaired." *Contreras v. State*, 312 S.W.3d 566, 574 (Tex.Crim.App. 2010), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). Statements that have been found to be involuntary under the Due Process Clause include factual scenarios in which a suspect was subjected to threats, physical abuse, or extended periods of interrogation without rest or nourishment. *See Oursbourn,* 259 S.W.3d at 170-71 (collecting cases).

In general, Texas law allows for a broader inquiry when considering involuntariness issues, and allows a court to consider more subjective considerations that are not relevant to Due Process claims. *Oursbourn*, 259 S.W.3d at 169-71. Under Article 38.21, a statement may be used again a defendant only if it was "freely and voluntary made without compulsion or persuasion . . . ." TEX.CODE CRIM.PROC.ANN. § 38.21. Section 6 of Article 38.22 provides that "where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." TEX.CODE CRIM.PROC.ANN. § 38.22, § 6. The Court of Criminal

18

Appeals has held that a statement "given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary . . . ." *Oursbourn*, 259 S.W.3d at 172-73. In determining the voluntariness of a confession under section 6, courts employ a totality of the circumstance test, and consider all of the circumstances surrounding its acquisition. *Wyatt v. State,* 23 S.W.3d 18, 23 (Tex.Crim.App. 2000); *see also Delao v. State,* 235 S.W.3d 235, 239 (Tex.Crim.App. 2007); *Umana v. State*, 447 S.W.3d 346, 351 (Tex.App.--Houston [14th Dist.] 2014, pet. ref'd).

*Law Enforcement Officers May Make Truthful Statements to an Accused*

The trial court suppressed the evidence based on a finding that the deputies threatened to arrest Luna if he did not admit to stabbing the victim. We have not found any such "threat" of this nature in the record. Although Deputy Evans advised Luna during the first video-recorded statement that it would be "better" if whoever did the stabbing was honest, he made no threat to arrest Luna if he did not confess. Moreover, we fail to see how Deputy Evans' statement could be considered as a "threat" of any sort. *See, e.g., United States v. Nash*, 910 F.2d 749, 752-53 (11th Cir. 1990)("[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to his cooperation with the government.").

The primary question presented by Issue Three is whether Luna's second video-recorded statement was rendered involuntary by the threats that the deputies made to arrest Luna's wife and her cousin, together with the related statements that Luna's his children could be left without a mother if his wife was arrested. Luna is correct that, in some instances, a threat to arrest an accused's family member can result in a confession being rendered involuntary. *See, e.g., Roberts v. State,* 545 S.W.2d 157, 161 (Tex.Crim.App. 1977)(a threat made by police officers to

19

arrest or punish a close relative or a promise to free a relative of a prisoner in exchange for a confession may render the prisoner's subsequently made confession inadmissible in evidence); *see also Contreras v. State*, 312 S.W.3d 566 (Tex.Crim.App. 2010)(threats to arrest defendant's wife rendered confession involuntary).

However, as the Court of Criminal Appeals recognized in *Contreras*, numerous courts have concluded that an officer's threat to arrest a family member during an interrogation does not render a confession involuntary when the officer had probable cause to make such an arrest. *Contreras*, 312 S.W.3d at 577. In *Contreras*, the defendant was home alone with his sister-in-law's child, and when the other family members returned, they found that the child was lifeless, and was later pronounced dead. During his interview with police, the defendant claimed that the officers told him that if he had not been the one who was responsible for the child's death, it could have been his wife, as she also took care of the child during the week, and that the police knew she had previously been arrested for a DUI and for assaulting a police officer. *Id.* at 570. The defendant further claimed that the police informed him that Child Protective Services would take away his kids if she was arrested. *Id.* In determining whether these threats rendered the defendant's confession involuntary, the Court noted that various federal and state courts have held that "law enforcement officials can threaten to arrest a family member, without vitiating the voluntariness of a confession, if they can lawfully effectuate such an arrest (i.e., if there is probable cause to arrest)." *Contreras*, 312 S.W.3d at 577 (collecting cases from various jurisdictions). Although the Court declined to decide whether to adopt such a rule in Texas, the Court found it significant that the officers in that case did not have probable cause to arrest the defendant's wife, as she was not with the child at the time she died, and that the defendant had therefore raised a fact

issue regarding whether a threat to arrest and prosecute his wife rendered appellant's confession involuntary. *Id*. at 577.

Although the Court of Criminal Appeals has not officially adopted this rule since it issued its opinion in *Contreras*, we note that at least one of our sister courts did so in a recent case, concluding that threats by law enforcement to arrest a defendant's family members did not render a confession involuntary where there was probable cause to carry out the threat of arrest. *See, e.g., Diaz v. State,* No. 13-14-00675-CR, 2017 WL 4987665, at \*5 (Tex.App.--Corpus Christi Nov. 2, 2017, pet. ref'd)(not designated for publication)(where police had probable cause to believe that defendant's parents were responsible for hindering the defendant's apprehension, defendant's confession was not rendered involuntary where the police advised the defendant of the possibility that his parents could be arrested).

We find the adoption of this rule to be in accordance with the general rule that a law enforcement officer conducting an interrogation is entitled to make truthful statements to an accused, and that when an officers makes a statement that constitutes an "accurate representation" of a defendant's situation, any such statement cannot be considered coercive and does not render a confession involuntary. *See, e.g., United States v. Phillips*, 230 Fed. Appx. 520, 524-25 (6th Cir. 2007)(focusing a suspect's attention on the potential legal consequences of his actions is not self-evidently coercive; indeed, it is more likely to focus the mind on the importance of answering questions accurately, voluntarily or not at all); *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001)(defendant's confession was voluntary where officers' statements to the effect that he would be going to jail for life and that he should therefore cooperate with the government to reduce his jail time were "accurate representations" of the defendant's situation); *United States v. Braxton,* 112 F.3d 777, 782 (4th Cir. 1997)(recognizing that a law "enforcement officer may

21

properly tell the truth to the accused," and that "[t]ruthful statements about [the defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary."); *Hernandez v. State*, 421 S.W.3d 712, 720 (Tex.App.--Amarillo 2014, pet. ref'd)(where interrogator made a statement regarding the potential length of a prison sentence faced by defendant, this was nothing more than "an accurate representation of [the defendant's] predicament that did not render the confession involuntary). If we were to hold otherwise, we would essentially be informing law enforcement that they are not permitted to make truthful statements to an accused, a result that defies logic and one that would unduly limit law enforcement officers in their ability to investigate a crime.

*Probable Cause Determinations*

The State acknowledges that the deputies did in fact threaten to arrest Luna's wife, her cousin, and her sister, and the record supports the trial court's conclusion that the deputies also advised Luna that he could not only lose access to his children, but that they could be left without a mother if his wife was arrested.[4] We therefore agree with the trial court's conclusion that these threats were in fact made during the interview. However, where we diverge from the trial court is with its conclusion that the deputies did not have probable cause to believe that Luna's wife, her sister, and her cousin were not involved in the stabbing or death of the victim, and the implied conclusion that the deputies did not have probable cause to arrest them.

The test for determining whether probable cause exists is whether at that moment the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy

---

[4] The record reflects that although the deputies did not directly state that the family members would be arrested if Luna did not confess, they at least impliedly did so, by suggesting that if Luna did not commit the crime then one of his family members must have done so, and that they would all "go down" for murder. As well, Deputy Galvan acknowledged during the hearing on the motion to suppress that he "threatened [Luna's] family."

information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense. *See Nelson v. State*, 848 S.W.2d 126, 133 (Tex.Crim.App. 1992). The test is an objective one, unrelated to the subjective beliefs of the arresting officer. *Amador v. State,* 275 S.W.3d 872, 878 (Tex.Crim.App. 2009).

*Probable Cause to Arrest Luna's Wife and Family Members*

As set forth above, during the second interview, Deputy Galvan advised Luna that the Sheriff's Office could arrest his wife and her family members who had participated in the incident with the victim, on a theory that they were parties to the offense. The law of parties doctrine is set forth in Section 7.02 of the Texas Penal Code, which provides that an individual may be found criminally responsible for an offense committed by another if, while acting the "intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See* TEX.PENAL CODE ANN. § 7.02(a)(2). Mere presence at the scene of a crime, without more, is insufficient to warrant a conviction under a "law of parties" theory. *Gross v. State*, 380 S.W.3d 181, 186 (Tex.Crim.App. 2012). Evidence is sufficient to convict a defendant under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement. *Wooden v. State*, 101 S.W.3d 542, 546 (Tex.App.--Fort Worth 2003, pet. ref'd). To determine whether an individual is a party to an offense, the reviewing court may look to "events before, during, and after the commission of the offense," and may rely on circumstantial evidence to prove a party's status. *See Gross*, 380 S.W.3d at 186; *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App. 1996)(opn. on reh'g).

Texas courts have uniformly upheld convictions for murder and/or manslaughter under a "law of parties" theory, in cases in which the defendant participated in a fight that led to the

victim's death, regardless of whether the defendant was the one responsible for inflicting the mortal wound to the defendant. *See, e.g., Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App. 1985)(holding that the evidence was sufficient to establish party liability for a homicide when the defendant was part of a group of people that "simultaneously and jointly attacked" the victim, even though the defendant himself did not inflict the mortal wound to the victim); *Chavez v. State,* 6 S.W.3d 66, 70 (Tex.App.--San Antonio 1999, pet. ref'd)(sustaining defendant's conviction for murder under a law of parties theory, where evidence demonstrated that the defendant participated in a fight, even if he only beat the victim, his actions encouraged and assisted those who actually stabbed the victim, effecting his death); *Rasberry v. State*, 757 S.W.2d 885, 887-88 (Tex.App.--Beaumont 1988, pet. ref'd)(evidence of defendant's action in participating in a fight with the victim was sufficient to sustain his conviction for assault under a law of parties theory, where his companion stabbed the victim during the fight, regardless of whether defendant knew that his companion had a knife at the time); *Gutierrez v. State,* 681 S.W.2d 698, 704 (Tex.App.--Houston [14th Dist.] 1984, pet. ref'd)(finding co-defendants' conviction for murder were supported by sufficient evidence, where co-defendants were involved in a fight that led to the victim's death); *Goff v. State,* 681 S.W.2d 619, 622-23 (Tex.App.--Houston [14th Dist.] 1983), *aff'd*, 720 S.W.2d 94 (Tex.Crim.App. 1986)(trial court did not err in giving jury an instruction on the law of parties doctrine where defendant admitted that he actively participated in a fight that led to the victim's death, despite denying that he was the one who fatally stabbed the victim).

In the present case, Luna advised the deputies during both of his interviews that his wife and her family members who were at the scene were actively involved in the fight with the victim. Luna stated that they were throwing punches during the fight, "rolling" on top of each other, and they were generally "going at it." More importantly, Luna informed the deputies at the start of the

24

second interview that after he and his wife repeatedly told the victim to leave their premises, his wife told the victim that she would "cut [his] face," if he did not leave. We find that Luna's statements to the deputies would have given a reasonably prudent police officer probable cause to believe that Luna's wife and other family members were subject to arrest for the victim's murder under a law of parties theory given their involvement in the fight with the victim. Further, Luna's statement with respect to the threat his wife made to "cut" the victim would have given a reasonably prudent law enforcement officer probable cause to arrest her as a primary actor. Consequently, when the deputies advised Luna that his wife and her family members could be arrested, the deputies were making truthful statements and providing him with an "accurate representation" of the situation he faced.[5]

As a corollary to this, we also note that if in fact Luna and his wife had been arrested and prosecuted for the victim's murder, the resulting consequence would have been that the two of them would not have been able to see their children except during visitation, and the children would have in effect lost their mother. Accordingly, we conclude that these statements were also truthful in nature, and cannot be considered coercive as a matter of law. *See, e.g., Hernandez v. State,* 421 S.W.3d 712, 721 (Tex.App.--Amarillo 2014, pet. ref'd)(considered as a whole and in the context of the entirety of the interrogation, the officer's statements emphasizing to appellant that she faced separation from her children were not threats of governmental action to punish a failure to cooperate but were accurate representations of her predicament); *see also United States v. Santos-Garcia,* 313 F.3d 1073, 1079 (8th Cir. 2002)(confession was not involuntary where the interrogating officers told the suspect that his story did not make sense and that his children would

---

[5]  We contrast this with the Court's holding in *Contreras*, in which it found that an officer's statement that his wife could be arrested was coercive, where there was no probable cause to support the statement. *Contreras*, 312 S.W.3d at 577.

be driving by the time he was released from prison, finding that the statement was nothing more than an accurate representation of the defendant's predicament). Finding none of the deputies' statements to be coercive, we hold that the trial court erred in determining that Luna's confession was involuntary on this basis. Issue Three is sustained. Having sustained all three issues, we reverse the order granting Luna's motion to suppress both video-recorded statements (State's Exhibits 1 and 2). The cause is remanded for further proceedings in accordance with this opinion.

April 30, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
Palafox, J. (Dissenting)

(Do Not Publish)