COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-22-00174-CR |
| Appellant, | § | Appeal from the |
| v. | § | 210th Judicial District Court |
| CLEVY MUCHETTE NELSON, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20210D02380) |

## **O P I N I O N**

The State charged Appellee, Clevy Muchette Nelson, by indictment in three counts for murder, manslaughter, and aggravated assault family violence with a deadly weapon after a motor-vehicle crash. After the incident, detectives from the El Paso Police Department (EPPD) questioned Nelson, resulting in a video-recorded statement. Nelson moved to suppress the video-recorded statement, asserting the detectives conducted a custodial interrogation after she unambiguously invoked her right to counsel. The trial court granted Nelson's motion. For the reasons below, we reverse.

## **BACKGROUND**

In the early hours of October 11, 2020, Nelson was involved in a car accident resulting in a fatality. Sgt. Pamela Smith of the EPPD arrived at the station for her shift at 5:30 a.m. and was

ordered to report to the Sierra Providence East Medical Center to stand by with Nelson. Sgt. Smith was told to transport Nelson to the Crimes Against Persons unit (CAP) at police headquarters.

Nelson was in a hospital bed sleeping when Sgt. Smith arrived. Sgt. Smith testified that she stayed in the room with Nelson for a short time, and then stood outside the door because Nelson was sleeping. Periodically, when Nelson was awake, Sgt. Smith would re-enter the room. Sgt. Smith testified she was at the hospital with Nelson "the entire morning," and Nelson knew that Sgt. Smith was waiting outside of the door. While she was receiving treatment and inside the hospital room, Nelson was not handcuffed or otherwise restrained.

Nelson was in and out of consciousness and when she awoke, she asked Sgt. Smith about her mother and fiancé. Sgt. Smith testified that she did not call or contact Nelson's mother. She told Nelson that family members were not allowed in the hospital rooms because of COVID-19 restrictions. Sgt. Smith testified every time Nelson awoke, she would inquire about her mom and her fiancé—asking if she could leave with her mom and asking about the welfare of her fiancé. On cross examination, Sgt. Smith denied exercising control over whom Nelson could contact, responding Nelson never asked if Sgt. Smith could call her mother for her. However, Sgt. Smith admitted she did not notify the hospital staff Nelson was asking to speak to or see her mother.

After Nelson was medically discharged, Sgt. Smith transported her to the Pebble Hills Regional Command Center. Sgt. Smith testified she told Nelson that she would be taken to the police station. Nelson moved slowly and assisted Nelson by holding her arm as she stepped into the marked police vehicle. Nelson was not handcuffed or restrained, but Sgt. Smith did assist Nelson with her seatbelt. Sgt. Smith further testified Nelson was not under arrest because she was not resisting or posing a physical threat. Sgt. Smith did not feel the need to handcuff Nelson. Sgt. Smith did not remember if Nelson asked why she was being transported, but she recalled

telling Nelson they would be going to the police station. Sgt. Smith told Nelson that "somebody needed to talk to her," but that she did not inform Nelson whether she would be questioned or interviewed. She never told Nelson she was free to go.

When they arrived at the Command Center, Sgt. Smith assisted Nelson out of the vehicle and through the entrance. Sgt. Smith could not recall if she was holding on to Nelson or if she stayed close by with her. Sgt. Smith escorted Nelson through a locked entrance using an access badge to an interview room with a couch and chairs. Nelson laid down on the couch and Sgt. Smith turned off the lights so Nelson "could rest."[1] Either Sgt. Smith or Sgt. Rathmann stayed in the room while Nelson slept on the couch. When asked whether she allowed Nelson to contact any family member while at the hospital or at the Command Center, Sgt. Smith responded: "No."

Nelson was transported a second time to CAP at police headquarters. Nelson was again taken through locked doors to a secured area. Sgt. Smith escorted Nelson and another detective met them and took Nelson to an interview room. Detective Garcia initiated the interview around 1:00 p.m. and told Nelson she was not under arrest. Garcia immediately gave Nelson her *Miranda* rights. Nelson's video-recorded interview lasts for three and a half hours and includes the following exchange which is at issue in this case:

Detective Garcia: Okay. You are not under arrest, okay? We're here to ask you questions in reference to the incident that occurred this morning, okay? You are at police headquarters right now, okay? You are in our office, Crimes Against Persons office, okay? Before we could ask you any questions, though, okay, I need to advise you of your rights, okay? So just hear me out. You have the right to remain silent and not make any statements at all. Any statements you make may be used against you at trial. Any statement you make may be used as evidence against you in court. You have a right to have a lawyer present to advise you prior to and during any

---

[1] Sgt. Smith testified that Nelson was sleepy and possibly intoxicated, which was later confirmed by a toxicology report.

3

questions. If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questions. You have the right to terminate the interview at any time. If you are not a United States citizen, you have the right to contact your consulate. Tell me this is true and correct, I understand my rights and I hereby knowingly, intelligently, and voluntarily waive these rights.

Nelson: I'd like to speak to my attorney.

Detective Garcia: You want to speak to your attorney? Okay. So we can't ask you nothing then. We're going to have to terminate the interview, okay? We don't know what happened. That was the whole reason why, okay? So we - - the only way we can know what happened is if we talk to you. But if you request an attorney, then the interview will be terminated.

Nelson: Can he just come here?

Detective Garcia: Can who come here?

Nelson: My attorney.

Detective Garcia: I don't know who your attorney is.

Nelson: It's the military, Chief of Justice.

Detective Garcia: I mean, again I'm assuming you're military, then, correct? You're active? I don't know how that works. I don't. We don't deal with them, okay? Like I said, our whole purpose here was to find out what happened this morning because we don't know what happened, okay? But before we can ask you any questions, we have to advise you of your rights.

Nelson: Uh-huh.

Detective Garcia: Okay. If you're requesting an attorney and we have to terminate the interview, and we can't ask you anything, okay.

[five second pause]

Nelson: Is it a lot of questions?

4

Detective Garcia testified that after he told Nelson he would terminate the interview, she was the first person to speak, immediately inquiring about the number of questions needed for the interview. Detective Garcia understood her question regarding the number of questions reflected Nelson affirmatively reinitiating the interview. Detective Garcia testified he believed she was voluntarily continuing with the interview. He then proceeded with the interview, asking Nelson if she had "changed her mind" and was now willing to voluntarily waive her rights. Nelson affirmatively agreed to waive her *Miranda* rights:

| Nelson: | Is it a lot of questions? |
|---|---|
| Detective Garcia: | Well, we're going to ask you what happened this morning because we don't know what happened this morning. That's the main question we were just going to hear you. |
| Nelson: | I don't know if I can answer. I have strep throat, but I can answer. |
| Detective Garcia: | I'm sorry? |
| Nelson: | I have strep throat . . . I can answer your questions. |
| Detective Garcia: | You have strep throat? Ok. So. Then you're saying that you change your mind, and you will talk to us. So you do understand your rights and you hereby knowingly, intelligently, and voluntarily waive those rights then? |
| Nelson: | Yes. |

Multiple times, Detective Garcia asks Nelson if she had changed her mind and was "knowingly, intelligently, and voluntarily waiving her rights." Nelson responded, "yes." Detective Garcia then continued with the interrogation.

Nelson moved to suppress the video-recorded interview, alleging that the statements within the video were procured in violation of Nelson's clearly invoked right to counsel. The trial court

granted Nelson's motion without issuing findings of fact or conclusions of law. This appeal followed.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). "A trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor are afforded almost total deference if they are reasonably supported by the record." *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019)). If the trial court does not make explicit findings of fact, "we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (citing *Herrera v. State*, 241 S.W.3d 520, 527 (Tex. Crim. App. 2007)). The determination of whether a person is in custody requires an application of law to the facts, and we review the trial court's implied finding de novo. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc). "[T]he trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *Allen v. State*, 479 S.W.3d 341, 348 (Tex. App.—El Paso 2015, no pet).

### B. Custodial Interrogations

The threshold issue is whether Nelson's video-recorded interview amounted to a custodial interrogation. "[C]ustiodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 348 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Miranda v. Arizona*, the United States Supreme Court established the necessary warnings to safeguard an unrepresented person's constitutional privilege against self-incrimination during a

custodial interrogation. *Miranda*, 384 U.S. at 442–51. Similarly, Article 38.22 of the Texas Code of Criminal Procedure provides the rules governing a defendant's oral statements that are the result of a custodial interrogation—a statement may not be used by the prosecution unless the defendant received Article 38.22 warnings prior to making the statement, and then knowingly, intelligently, and voluntarily waived those rights. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (stating that the Article 38.22 warnings "are virtually identical to the *Miranda* warnings"); TEX. CODE CRIM. PRO. ANN. art. 38.22 § 2.

A person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained such that he is not free to leave, to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). Courts apply an objective standard to determine whether a person is in custody—the subjective views of law enforcement or the person being questioned are not determinative. *Id.* The Court of Criminal Appeals has established four general situations that may constitute custody: (1) if the subject is physically deprived of her freedom in any significant way; (2) a law enforcement officer tells the suspect that she cannot leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe her freedom of movement has been significantly restricted; or (4) there is probable cause to arrest the subject, and law enforcement officers do not tell the suspect she is free to leave. *See Wexler*, 625 S.W.3d at 167–68. These four categories are descriptive and not exhaustive. *State v. Ortiz*, 382 S.W.3d 367, 376 (Tex. Crim. App. 2012).

"To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on her freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by her." *Wexler*, 625 S.W.3d at 168 (citing *Ortiz*, 382 S.W.3d at 367). When determining whether a person is in custody, courts consider "whether

the suspect arrived at the place of interrogation voluntarily, the length of the interrogation, whether the suspect's requests to see relatives and friends are refused, and the degree of control exercised over the [person]." *Ervin v. State*, 333 S.W.3d 187, 205 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (quoting *Xu v. State*, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref'd)). Courts also consider "the amount of force displayed . . . the efficiency of the investigative process, whether the restraint occurs at the original location or the person is transported to another location, and whether the officer told the detained person that the person was under arrest or was being detained only for a temporary investigation." *Martinez v. State*, 496 S.W.3d 215, 220 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

Law enforcement's transportation of persons to police facilities during an investigation and station house for questioning is not dispositive, transportation is only a factor to consider when determining whether a person is in custody. *State v. Consaul*, 960 S.W.2d 680, 686 (Tex. App.—El Paso 1997) *pet. dism'd improvidently granted by*, 982 S.W.2d 899 (Tex. Crim. App. 1998). However, what may begin as a noncustodial interrogation can later escalate into a custodial interrogation. *Id.* The defendant has the burden to establish that the statement was the product of custodial interrogation. *Wexler*, 625 S.W.3d at 167–68 (citing *Herrera*, 241 S.W.3d at 526).

### C. Custody

In the State's first issue, it contends that the trial court erred in impliedly concluding Nelson was in custody at the time she was questioned by Detective Garcia. Nelson contends she was in custody because she was transported by police multiple times to two locations, law enforcement exercised control over her communications, and she was held for over seven hours and interviewed for three. We agree with Nelson.

8

Nelson was transported to the hospital during the early hours of the morning and, although we recognize she was under the care of the hospital prior to her discharge, Nelson's room was monitored, and she was aware a police officer was stationed at the door of her room. *See Redmond v. State*, 30 S.W.3d 692, 697 (Tex. App.—Beaumont 2000, pet. ref'd) (considering whether a defendant was under guard while receiving medical treatment as a factor in the custody analysis). When Nelson was discharged, she was *told* by Sgt. Smith she would be transported to the police station. Nelson was not told why she was being transported, only that she would be transported. Once Sgt. Smith transported Nelson to the Command Center, Nelson was taken to an interview room, watched by a police officer, and slept on a couch.[2] After some time passed, Sgt. Smith woke Nelson and again *told* her that she would be taken to headquarters because "someone wanted to speak with her." Once again, Nelson was transported, this time from the interview room at the Command Center to police headquarters. At CAP, Sgt. Smith escorted Nelson through locked doorways into a secure area, where a detective took her to another interview room.

At the start of the video-recorded interview, Nelson appears in the corner of the room, alone. How long Nelson was left alone to await questioning is not developed in the record, however it does reflect the interview eventually commenced at 12:58 p.m. Detective Garcia initiated the interview by telling Nelson she was not under arrest and immediately administered the *Miranda* rights to her.[3] Nelson's video-recorded interview lasts three and a half hours. Throughout the recording, Nelson asks to call or speak to her mother—the detectives did not allow Nelson to call

---

[2] The record does not indicate how long Nelson was at Central Command, only that Sgt. Smith arrived at the hospital around 6:00 a.m. and Nelson's video-recorded interview ended at 4:30 p.m.

[3] While Detective Garcia's statement Nelson was not under arrest factors into our analysis, it is not dispositive. *See Amores v. State*, 816 S.W.2d 407, 412 (Tex. Crim. App. 1991) (en banc) (stating that an officer's opinion is not controlling); *Charles v. State*, No. 05-20-00458-CR, 2021 WL 4988319, at *6 (Tex. App.—Dallas 2021, pet. ref'd) (mem. op., not designated for publication) ("[Officer's] statement that there was no formal arrest does not resolve whether there was a comparable restraint on [the defendant's] movement."

or speak to her mother. At the conclusion of the recording at 4:30 p.m., Nelson is told she will be escorted out.

Nelson was never told she was free to leave, nor was she invited to voluntarily come to the police station—Sgt. Smith waited outside her hospital room until she was discharged and then she was informed she was being transported to the police station. Nelson was consistently monitored during her entire interaction with law enforcement. During her interview, she was escorted to the restroom by a uniformed officer. Additionally, law enforcement agents ignored Nelson's requests to contact her mother and exercised control over her communications at the hospital and at the Command Center. Sgt. Smith testified when Nelson asked if she could leave with her mom or contact her mom, Sgt. Smith ignored or denied the requests.[4] Although the record does not indicate what time Nelson was discharged by the hospital, it does indicate Sgt. Smith was at the hospital and posted at Nelson's door as early as 6:00 a.m. Over the next ten to eleven hours, Nelson was transported twice and questioned intermittently for three and a half hours. The totality of the circumstances around Nelson's interaction with law enforcement, considered from an objective standpoint, leads us to conclude a reasonable person in Nelson's situation would have perceived that their movement was significantly restricted to such an extent she was not free to leave. *See Wexler*, 625 S.W.3d at 167–68. We further conclude the trial court did not abuse its discretion when it impliedly found that Nelson was in custody, and we overrule the State's first issue.

---

[4] During the video-recorded interview, Nelson asks multiple times to speak to her mother and is given conflicting responses by the officers. At one point she is told by the interviewing detectives they will call her mom, but she is later told by a third officer that she must wait to call her mom until the detectives say that she can. *See McCulley v. State*, 352 S.W.3d 107, 116 (Tex. App.—Fort Worth 2011, pet. ref'd) (considering statements by the police that defendant could not leave until police had "finished," and concluding the defendant was in custody) When Nelson asks again to call her mother, Nelson is told the detectives have spoken to her mother and informed her Nelson is at the police station speaking with them. At 3:24 p.m. the video-recorded interview shows Nelson standing and opening the door to the interview room, presumably to leave, at which point she is told by an officer off screen "you can't just freely walk out of here . . . you are not free to go." However, as the State notes in its brief, Nelson was never told that she was not free to leave until after the majority of the interview was completed.

**D. Waiver of *Miranda* and the *Edwards* Rule**

As the result of our conclusion Nelson was in custody, *Miranda* and Article 38.22 apply. Next, we consider the State's second issue in which it contends Nelson voluntarily waived her right to counsel.

Before a custodial interrogation begins, law enforcement must advise the person in custody of the right to consult with an attorney prior to questioning or to have counsel present during questioning. *Miranda*, 384 U.S. 467–70. To successfully invoke the right to counsel, the suspect must articulate the desire for counsel clearly and unequivocally such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010) (quoting *State v. Gobert*, 275 S.W.3d 888, 893 (Tex. Crim. App. 2009)).

In *Edwards v. Arizona*, the United States Supreme Court held that once a suspect invokes the right to counsel, all interrogation by law enforcement must cease until counsel is provided. 451 U.S. 477, 484–85 (1981). This bright-line rule is designed to protect a suspect in police custody who has invoked his right to counsel from being badgered by the police. *Id.*; *see also Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). Under the *Edwards* rule, law enforcement must wait for counsel to be available to the suspect, unless the suspect "initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85. A suspect that invokes her right to counsel may nonetheless "countermand his election" and later waive the right. *Edwards*, 451 U.S. at 485; *Cross*, 144 S.W.3d at 526.

The Supreme Court later clarified the *Edwards* rule in *Oregon v. Bradshaw*, "by establishing a two-step procedure to determine whether a suspect has waived a previously invoked right to counsel." *Johnston v. State*, No. 08-20-00014-CR, 2022 WL 2235984, at * 3 (Tex. App.—

11

El Paso 2022, pet. ref'd) (not designated for publication) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1043–46 (1983)). The first step requires proof that the suspect, and not law enforcement, reinitiates communication after invoking the right to counsel. *Cross*, 144 S.W.3d at 527. A suspect may reinitiate by showing "a willingness and a desire for a generalized discussion about the investigation[.]" *Bradshaw*, 462 U.S. at 1045–46. The second *Edwards* step requires proof that, after the suspect reinitiates communication, the suspect validly waives the right to counsel. *Cross*, 144 S.W.3d at 527. Waiver is effective if it is made knowingly, intelligently, and voluntarily—it must be "a free and deliberate choice" and not produced through "intimidation, coercion, or deception." *See Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). When both steps are shown, the *Edwards* rule is fully satisfied. *Cross*, 144 S.W.3d at 527.

### E. Right to Counsel

Here, the parties do not dispute that Nelson clearly and unambiguously invoked her right to counsel. At the start of her video-recorded interview, Detective Garcia read Nelson her rights and she responded: "I'd like to speak to my attorney." Instead, the parties dispute whether Nelson waived that right after she invoked by reinitiating conversation with Detective Garcia.

| | |
|---|---|
| Detective Garcia: | I mean, again I'm assuming you're military, then, correct? You're active? I don't know how that works. I don't. We don't deal with them, okay? Like I said, our whole purpose here was to find out what happened this morning because we don't know what happened, okay? But before we can ask you any questions, we have to advise you of your rights. |
| Nelson: | Uh-huh. |
| Detective Garcia: | Okay. If you're requesting an attorney and we have to terminate the interview, and we can't ask you anything, okay. |

[five second pause]

Nelson: Is it a lot of questions?

Detective Garcia: Well, we're going to ask you what happened this morning because we don't know what happened this morning. That's the main question and we were just going to hear you.

Nelson: I don't know if I can answer. I have strep throat, but I can answer.

Detective Garcia: I'm sorry?

Nelson: I have strep throat . . . I can answer your questions.

Detective Garcia: You have strep throat? Ok. So. Then you're saying that you change your mind, and you will talk to us. So you do understand your rights and you hereby knowingly, intelligently, and voluntarily waive those rights then?

Nelson: Yes.

At the hearing on the motion to suppress and on appeal, Nelson contends Detective Garcia did not faithfully terminate the interview after Nelson invoked her right to counsel. Nelson's contention hinges on the duration of the time, around thirty seconds, between Nelson's invocation and her question regarding the number of questions which the State maintains "reinitiated" the interview. According to Nelson, Detective Garcia did not terminate the interview, and his continued presence was "fishing" for information in violation of Nelson's rights. At the motion hearing, Nelson conceded if the trial court found Nelson had reinitiated, then Detective Garcia satisfied the second *Edwards* requirement by asking Nelson to confirm that she was voluntarily waiving her previously invoked rights.

Nelson cites *Michigan v. Mosely*, a case in which the Supreme Court enumerated several factors for courts to consider when analyzing whether law enforcement "scrupulously honored" a suspect's invocation of the right to remain silent. 423 U.S. 96, 104 (1975). One of the *Mosely*

13

factors is the length of time between the initial and subsequent questioning. *Id.* However, Nelson did not invoke her right to silence, only her right to counsel. Once a suspect invokes the right to counsel, all *interrogation* must cease until counsel or an opportunity to consult with counsel is provided. *Miranda*, 384 U.S. 467–70. Interrogation, for the purpose of *Miranda*, means express questioning, and includes words or actions by law enforcement that they "[should have known were] reasonably likely to elicit an incriminating response[.]" *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012); *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980). Interrogation is more than "subtle compulsion." *Innis*, 446 U.S. at 303.

We cannot conclude on this record, Detective Garcia's statements that he must terminate the interview if Nelson invoked, or the only way he could learn what happened was through questioning of Nelson, rise to the level of interrogation. Here, Nelson clearly invoked her right to counsel, and almost immediately reinitiated the interview after clearly being told it would terminate. Nelson, on this record, expressed a "willingness and a desire for a generalized discussion about the investigation" as required by *Edwards* and *Bradshaw*. *See Bradshaw*, 462 U.S. at 1045–46. Further, Detective Garcia again asked Nelson if she would voluntarily waive her rights and Nelson responded "yes." We conclude Nelson was fully aware of her rights and voluntarily, knowingly, and intelligently waived those rights when she proceeded with the interview. Accordingly, we must conclude the trial court erred when it granted Nelson's motion to suppress because the video-recorded statements were made after Nelson was informed of, invoked, and then voluntarily waived her right to counsel by reinitiating conversation about the investigation with Detective Garcia. We sustain the State's second issue.

14

## CONCLUSION

We sustain the State's second issue and reverse the trial court's order granting Nelson's motion to suppress. We remand this case to the trial court for further proceedings.

YVONNE T. RODRIGUEZ, Chief Justice

June 28, 2023

Before Rodriguez, C.J., Palafox, and Soto, J.J.
Palafox, J., dissenting

(Do Not Publish)